**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JOHN W. STONE OIL DISTRIBUTOR, L.L.C.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 06-2377** |
| **BOLLINGER SHIPYARDS, INC., ET AL.** | **SECTION "S" (5)** |

## ORDER AND REASONS

**IT IS ORDERED** that cross-motions for summary judgment are **DENIED** in part and **GRANTED** in part. (Rec. Docs. 54 & 59).  Stone is entitled to a presumption of negligence.

## BACKGROUND

Plaintiff, John W. Stone Oil Distributor, L.L.C, filed a complaint against defendants, Bollinger Shipyards, Inc., Bollinger Algiers, L.L.C., and Bollinger Calcasieu (collectively "Bollinger") alleging that Stone suffered damages on August 29, 2005 during Hurricane Katrina when Bollinger's MISS DARBY collided with Stone's M/V STONE BUCCANEER.  Stone asserts that the M/V STONE BUCCANEER was moored at Stone's dock in Gretna, Louisiana when the MISS DARBY, a drydock that was moored two miles away at Bollinger's Algiers facility, broke her mooring lines and drifted away from Bollinger's facility eventually striking the M/V STONE BUCCANEER.  As a result of the collision, Stone alleges that it suffered damages including lost and contaminated cargo, loss of use, and costs of repairs.

## DISCUSSION

**1.     Standard of Review**

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir.1991); Fed.R.Civ.P. 56(c). A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit, and an issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

If the moving party meets its initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmovant cannot satisfy his summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson*, 106 S.Ct. 2505, 2511 (1986).

**2.     Cross- Motions for Summary Judgment**

Stone and Bollinger have filed cross-motions for summary judgment. Stone asserts that

Bollinger failed to take the necessary storm precautions to keep the MISS DARBY from breaking her moorings and drifting unsecured in the river during the hurricane.

The MISS DARBY, which was intended to be permanently moored a the Bollinger facility, was secured by two single pilings driven vertically into the riverbed, with circular collars attached to her and around the pilings.  Stone asserts that the two-piling attachment was an insufficient mooring system during Hurricane Katrina and that Bollinger should have known it was insufficient. Stone contends that the MISS DARBY had broken away from the facility on previous occasions when the river level rose, causing the pilings to buckle near the river bottom and allowing the MISS DARBY to drift into the Mississippi River.   According to Tom Usey, Bollinger's yard superintendent, the metal pilings would crease at times when the MISS DARBY would sink to the river bottom, and Stone contends that the pilings bent in the same way during Hurricane Katrina.

Stone asserts that the MISS DARBY should have been moored like the MR. JACKSON, a larger dry dock located immediately next to the MISS DARBY.  The MR. JACKSON was moored to "battered pilings," consisting of one vertical steel piling with two angled support pilings driven into the riverbed and attached to the sides of the vertical piling.  The MR. JACKSON was exposed to the exact same conditions of the hurricane, but unlike the MISS DARBY, remained stationary and did not drift away from the facility during the storm.  Stone asserts that Bollinger should have installed this battered piling system for the MISS DARBY and, in fact, did install that system after Hurricane Katrina.  Stone asserts that it was negligent for Bollinger not to use a battered piling system or not to install additional mooring lines or a deadman system to secure the MISS DARBY before the hurricane.  Stone argues that Bollinger's negligence, not the hurricane, cause the MISS DARBY to break away.  Stone also alleges that the MISS DARBY was a "vessel" when it collided

with the M/V STONE BUCCANEER, thereby providing a presumption of negligence on Bollinger under the *LOUISIANA* rule.

Stone also argues that Bollinger failed to follow its own hurricane preparedness plan, which required it to take several steps before hurricane season.  Stone cites as examples mapping the yard layout, assigning responsibilities to certain persons, and developing a list of actions to take in advance of a hurricane.  Stone further asserts that under the plan Bollinger was supposed to make preliminary hurricane plans once a hurricane was 72 hours away.  Stone asserts that Usey admitted that Bollinger did not take the steps outlined in its own plan.

Stone contends that in asserting an "Act of God" defense, Bollinger has a heavy burden of proof to establish that human skill could not have prevented the collision.  Stone asserts that Bollinger should have performed an engineering evaluation of the mooring system of the MISS DARBY prior to Hurricane Katrina, but instead, relied on Usey's opinion that no additional steps were needed to secure the MISS DARBY before the storm. Stone contends that it was negligent for Bollinger to rely on Usey's opinion because Usey has no formal education and has no expertise regarding mooring systems.

Bollinger contends that Stone has not established a prima facie case of negligence.  Bollinger argues that the piling system of the MISS DARBY was a system that has been in use for 40 years, had survived Hurricanes Camille and Betsy, and that the pilings were approved by the Department of the Army, and therefore, it was reasonable for Bollinger to believe that no additional steps were necessary to secure the MISS DARBY.   Bollinger asserts that the MISS DARBY moved up and down on the pilings with the rise and fall of the river.   Bollinger asserts that it closely tracked the hurricane, and once Governor Kathleen Blanco announced that New Orleans was within the "strike

4

zone," it assembled a team to secure the shipyard.  Bollinger argues that its team of 12 employees worked for several hours securing equipment and materials the Saturday before the storm struck. Following Bollinger's emergency preparedness plan, some employees secured loose items, while others moved mobile equipment to safe areas, and Usey and others welded braces to secure scaffolding and checked to be sure that pumps in the shipyard were operational.  Further, Usey made sure that the cables for the MISS DARBY and the MR. JACKSON were secure.  Usey and another Bollinger employee, Gary Martin, rode out the storm at the Bollinger Algiers facility.

Bollinger contends that it was impractical to add additional mooring lines to the MISS DARBY  because they would have been tied 105 feet away and would have needed constant adjustment during Hurricane Katrina.  Further, Bollinger argues that Stone has no evidence that additional mooring lines would have prevented the MISS DARBY from breaking away.   Instead, Bollinger asserts that Hurricane Katrina and its winds and storm surge caused the MISS DARBY to break loose and to collide with the M/V STONE BUCCANEER.  Bollinger asserts that the collision occurred due to an "Act of God."

Bollinger denies that the MISS DARBY was a vessel and asserts that Stone is not entitled to any presumption of negligence.  Therefore, Bollinger argues that Stone has not proved its prima facie case of negligence sufficient to survive the motions for summary judgment.

**Motions for Summary Judgment**

       **1).**      **Negligence**

The MISS DARBY is a floating drydock which was not designed to be moved and was attached to the riverbed with two single pilings.  Bollinger contends that this permanently attached drydock is not a vessel, and Stone is not entitled to the presumption of negligence, which applies

to moving vessels.   Instead, Bollinger asserts that Stone must establish negligence by a preponderance of the evidence.   Stone contends that once the drydock floated away from its moorings, it became a vessel.

Under the general maritime law, it is well settled that when a drifting vessel causes damage to a stationary object, there is a presumption that the moving ship is at fault.   *The LOUISIANA*, 70 U.S. (3 Wall) 164, 173, 18 L.Ed. 85 (1865). This presumption of negligence is based on the logical deduction that a drifting vessel was mishandled or improperly moored.   *James v. River Parishes Co., Inc.*, 686 F.2d 1129, 1132-33 (5th Cir.1982). "This presumption operates to shift the burden of proof-both the burden of producing evidence and the burden of persuasion-onto the moving ship ." *Delta Transload, Inc. v. M/V Navios,* 818 F. 2d 445, 449 (5th Cir. 1987).   The burden is heavily upon the vessel asserting such a defense.   The moving vessel may rebut the presumption by showing, by a preponderance of the evidence, that the collision was (1) the fault of the stationary object, (2) that the moving ship acted with reasonable care, or (3) that the collision was an unavoidable accident. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct. 1488 (1978)).

It is clear that a floating drydock is not a 'vessel' within the meaning of admiralty jurisdiction when the drydock is moored and in use as a drydock.   *Bender Shipbuilding & Repair Co., Inc. v. Brasileiro*, 874 F. 2d 1551, 1555 (11th Cir. 1989)(citing *Keller v. Dravo Corp.*, 441 F.2d 1239, 1244 (5th Cir.1971), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972)); 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 3-6 (4th Ed. 2007); *Cook v. Belden Concrete Products, Inc.*, 472 F. 2d 999, 1002 (5th Cir. 1973)). However, "floating drydocks have been classified as 'vessels' for admiralty purposes when they become active some way in navigation."

*Bender,* 874 F. 2d at 1555 (citing *United States v. Moran Towing & Trans. Co.*, 374 F.2d 656, 663 (4th Cir.1967), *vacated on other grounds,* 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968) (floating drydocks in transit across navigable waters were vessels within admiralty jurisdiction under the Wreck Act); *J.M.L. Trading Corp. v. Marine Salvage Corp.*, 501 F.Supp. 323, 325-26 (E.D.N.Y.1980) ("when floating drydock is treated like a ship or vessel and is used like one, thereby losing its attributes as an extension of land, it may very well be found to be within the admiralty jurisdiction of the federal courts.").

Although the court in *Bender* was faced with the issue whether a drydock which broke free of its moorings was a vessel, the court declined to decide that issue stating that although it was arguable that the drydock became a vessel when is entered navigable waters, jurisdiction was more properly vested through the tort branch of admiralty.  *Bender,* 874 F. 2d at 1555.  The court in *Bender* was not called upon to apply a presumption of negligence.

Other cases, although not directly addressing vessel status, have applied the presumption of negligence when barges and logs rafts broke free of their moorings and drifted, striking other vessels or objects.  *James v. River Parishes Company, Inc.,* 686 F. 2d 1129, 1130 (5th Cir. 1982)(presumption of negligence applied to drifting barge that ran into vessel); *Hood v. Knappton Corp., Inc.,* 986 F. 2d 329, 332 (9th Cir. 1993)(presumption applied to log raft which broke free of moorings striking fishing boats); *Congra, Inc. v. Weber Marine, Inc.*, 2000 WL 943198, at \*5 (E.D. La. Jul. 7, 2000)(applying the presumption when a barge broke its moorings, striking a bridge and dock);*Union Pacific Railroad Co. v. Heartland Barge Management, L.L.C.*, 2006 WL 2850064, at \*12-\*13 (S.D. Tex. Oct. 3, 2006)(applying the presumption of negligence when barges broke their moorings and collided with a vessel).

It is not disputed that the MISS DARBY was a moored drydock before Hurricane Katrina struck. However, like the floating drydocks, barges, and log rafts discussed above, once the MISS DARBY broke free of its moorings and drifted in the Mississippi River, the drydock entered navigable waters and began drifting. This Court holds that once the MISS DARBY broke free it its moorings and began drifting in the river, it became a vessel. Therefore, Stone is entitled to the presumption of negligence under *The LOUISIANA*.

  2)  **"Act of God" Defense**

Bollinger contends that Hurricane Katrina was an "Act of God" and therefore, it is not liable for any damages sustained by Stone. However, simply asserting the "Act of God" defense is insufficient, because the defendant must prove not only that the weather was heavy but also that it took reasonable precautions to avoid the damage. James E. Mercante, *Hurricanes and Act of God; When the Best Defense is a Good Offense*, 18 U.S. F. Mar. L. J. 1 (2005-2006).

In support of its argument, Bollinger cites *In Petition of United States (Dammers & Van Der Heide Shipping & Trading (Antilles), Inc. v. Steamship Joseph Lykes)*, 425 F. 2d 991 (5th Cir. 1970), a case addressing the "Act of God" defense and Hurricane Betsy. After trial, the judge concluded that the defendants were not liable for damage caused by their vessels that broke loose from their moorings because Hurricane Betsy was an "Act of God." *Id*. The Fifth Circuit upheld that conclusion and explained that the test for determining whether the defendants were free from fault is whether they took reasonable precautions under the circumstances as known or reasonably to be anticipated. *Id.* at 995. If the defendants were reasonable in their anticipation of the severity of the impending storm and undertook reasonable preparations in light of such anticipation, then they are relieved of liability. *Id.* The standard of reasonableness is that of prudent men familiar with the

8

ways and vagaries of the sea. *Id.* The court explained that the defendants added additional moorings to one vessel in anticipation of the hurricane and that the moorings on the second vessel had been strengthened by additional lines. *Id.* These additions were inspected by the defendant and found to be sufficient for the hurricane. *Id.* Nevertheless, the vessels broke free and collided with another moored vessel. *Id.* The evidence before the trial court showed that the defendant's vessel were holding until two or more dock bollards were pulled from their concrete foundations due to the wind and tidal surge of the hurricane. *Id.* Further, a naval architect for defendant stated that he had never heard of such winds occurring in New Orleans and had never heard of an anchor chain breaking under pure strain, as happened with one of the defendant's vessels. *Id.* The court found that the weight of the evidence as a whole demonstrated that the defendants were not negligent in making preparations for the storm and that the damage caused resulted solely from the catastrophic forces of Hurricane Betsy. *Id.*

Bollinger also cites *Skandia Ins. Co., Ltd. v. Star Shipping AS*, 173 F. Supp. 2d 1228 (S.D. Ala. 2001), which addressed the "Act of God" defense for damaged cargo resulting from Hurricane Georges. The court applied the definition of "Act of God" as "[a]ny accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected could have been prevented;" and/or "a disturbance ... of such unanticipated force and severity as would fairly preclude charging ... [Defendants] with responsibility for damage occasion[ed] by the [Defendants'] failure to guard against it in the protection of property committed to its custody." *Id.* at 1239 (citing 1A C.J.S. Act of God at 757 (1985); *Compania De Vapores Insco S.A. v. Missouri Pacific R.R. Co.*, 232 F.2d 657, 660 (5th Cir.1956), *cert. den.*, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956)).

The Court explained that hurricanes, such as Hurricane Georges, are considered in law to be and "Act of God." *Id*. at 1239-1240.  However,  an "Act of God" will insulate a defendant from liability only if there is no contributing human negligence and the defendant has the burden of establishing that weather conditions encountered constituted an uncontrollable and unforeseeable cause by an "Act of God."  *Id*. (citing *Freedman & Slater, Inc. v. M.V. Tofevo*, 222 F.Supp. 964 (S.D.N.Y.1963)).

The Court found that the defendants had no knowledge that the area where the cargo was stored had flooded in the past, and the weather forecasts were constantly changing prior to landfall of the storm.  *Id*. at 1242.  The court also reviewed numerous exhibits regarding the weather monitoring entities and considered whether the defendants could have been award of the flooding danger based on the weather reports.  *Id*.  The court determined that the defendants acted reasonably because the cargo was stored in a location where they had never known it to flood and/or receive hurricane damage in the past and because they had no notice or knowledge that such flooding would take place and reasonably believed that the cargo was safe and secure.  *Id.* at 1252.

Bollinger is entitled to the "Act of God" defense only if Bollinger undertook reasonable preparations such that there was no negligence on the part of Bollinger.  Based on the contested material facts presented in the cross-motions for summary judgment, this Court finds that whether Bollinger's preparations were reasonable is an issue to be determined by the jury.  Summary judgment on the "Act of God" defense is denied.

## **CONCLUSION**

This Court finds that cross-motions for summary judgment are denied in part and granted in part.  Stone is entitled to a presumption of negligence.

New Orleans, Louisiana, this ___12th___ day of September, 2007.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**